EMPLOYERS REINSURANCE CORPORATION, a corporation, Plaintiff,

v.

AMERICAN FIDELITY AND CASUALTY COMPANY, Inc., a corporation, Defendant.

AMERICAN FIDELITY AND CASUALTY COMPANY, Inc., a corporation, Plaintiff,

v.

EMPLOYERS REINSURANCE CORPORATION, a corporation, Defendant.

Nos. 11814, 11895.

United States District Court
W. D. Missouri, W. D.

Dec. 14, 1959.

Douglas Stripp, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for Employers Reinsurance Corp.

Sebree, Shook, Hardy & Ottman, Kansas City, Mo., for American Fidelity and Cas. Co., Inc.

RIDGE, Chief Judge.

The issue in each of the above cases is whether Employers Reinsurance Corporation (hereinafter referred to as "Employers" or the "Reinsurer") is liable to American Fidelity and Casual-

ty Company, Inc., (hereinafter called "American" or the "Reinsured") under applicable reinsurance treaties, for amounts paid by American in excess of primary policy limits stated in two policies of liability insurance issued by American because of American's "bad faith" failure to settle the liability of the insured named in the primary policies when American could reasonably have done so within the limits of the primary liability policy coverage.

In Case Number 11895, American alternatively sues Employers in two counts for breach of one reinsurance contract in respect to the above matter. In Case Number 11814, Employers seeks summary judgment of non-liability to American on a different contract concerning the above proposition. Both parties have filed motions for summary judgment, supported by affidavits. It appears that no facts are in dispute between the parties as to any issue raised or presented by the pleadings herein. Hence, these cases are ripe for disposition on ruling the above motions. In so doing, the facts in respect to the two claims will be separately stated. However, applicable law to both claims being the same, conclusions thereof will be singularly stated.

### Case Number 11895.

American issued a basic policy of liability insurance in Oklahoma to L. C. Jones Trucking Company, with coverage up to $25,000. By the terms of a reinsurance treaty (Ex. A herein) American retained $10,000 of the liability loss exposure thereof, while Employers reinsured the balance, $15,000. Employers' maximum reinsurance coverage under the treaty, supra, was $90,000 measured by the "Definition of Loss and Claim Expenses" stated in Article 3 thereof. American's Retention as to each policy loss was $10,000, unless the whole loss was excluded from the treaty, as stated in Article 5. "Loss", within the ambit of the treaty, was stated to "mean only such amounts, within applicable policy limits, as are actually paid in cash by the reinsured to claimants in settlement of claims or in satisfaction of judgment;

but the word 'loss' shall not include claim expenses." "Claim Expenses" was defined to "mean court costs, interest upon judgments, insurance afforded for first aid medical expense, and allocation, investigation and legal expense, paid by the reinsured." The treaty provided that the reinsurer will *indemnify the reinsured* against that portion of claim expense that the amount of the loss ultimately borne by the reinsurer bears to the total amount of the loss. As respects expenses connected with appeal taken by the reinsured from a verdict or judgment which is in excess of the reinsured's Retention, Employers agreed to *"indemnify the reinsured* (i. e. American) against that proportion of the claim expenses connected with such appeal, that the amount of such appeal or judgment in excess of the reinsured's Retention bears to the total amount of such verdict or judgment, *excluding from such computation such part of such verdict or judgment as may be in excess of the limits provided by the policy."* (Emphasis added.)

Under Article 10 of the treaty, American agreed it would:

"* * * investigate, settle or defend all claims arising under policies with respect to which reinsurance is afforded by this agreement, and that it will give prompt notice to (Employers) of any event or development which, in the judgment of (American), might result in a claim (against Employers) and will forward promptly to (Employers) copies of such pleadings and reports of investigations as may be requested by (Employers)." (Parentheses added.)

Employers had the right, at its own expense, to participate jointly with American in the investigation, adjustment or defense of claims to which, in the judgment of Employers, it is, or might become exposed. By the treaty Employers agreed to reimburse American *"promptly for all loss against which indemnity is herein provided,"* upon receipt in the Home Office of Employers of satisfactory evidence of payment of such loss.

(See Jones et al. v. Eppler, 266 P.2d 451, 48 A.L.R.2d 333, where the parties occupied reverse positions in the trial Court; which is hereinafter referred to as the Oklahoma case), arose out of an accident which occurred in the State of Oklahoma on June 14, 1948, that involved a basic insured of American. The reinsurance treaty, supra, (Ex. A), was applicable coverage. Employers was first notified of the Eppler claim when it received American's letter of April 10, 1951, which advised Employers that a verdict of $31,000.00 had been returned in favor of Eppler against the basic insured. American's letter explained the facts of the accident; stated that "the one and only (settlement) demand we ever received in the case (before trial and verdict) was $15,000.00, which we thought was ridiculous" (par. added) and that the outcome of the trial had not been expected. Enclosed with this letter was the trial brief of American's attorney. Employers replied on April 16, 1951, asking to be kept informed of any further developments. In the latter part of May, 1951, the vice president of Employers visited the home office of American, where he reviewed the Eppler v. Jones claim file. On June 28, 1951, Employers wrote American, referring to the visit and recalling that motions for new trial had been filed in the Oklahoma case, and asked to be kept informed of further developments. American replied on September 11, 1951, that the motions for new trial had been overruled and that its attorney strongly recommended an appeal, although there would be some difficulty encountered in posting the appeal bond because the amount thereof was above the policy limits.

(Observe that up to this point the reinsurer did not have the opportunity to participate in any settlement negotiations or decisions regarding settlement of the Oklahoma case.)

American again wrote Employers on September 24, 1951, that an appeal was still being urged by its attorney and that *plaintiff's attorney had submitted a proposition of $25,000.00 for settlement* but that its attorney recommended that this figure be not considered. This letter of September 24, 1951 closed with the following paragraph:

"We don't think this case is even worth our Retention of $10,000.00, however, since there is an outstanding verdict of $31,000.00, we will go along with whatever you want to do concerning the case. However, it is our recommendation that we continue with our appeal."

Employers replied on September 28, 1951, in the following language (in part):

"Some time ago, we had a discussion on possible appeal and we presume that it is going to be somewhat difficult to make bond in excess of the policy limit. If you decide on appeal, we will be very glad to go along, but on the other hand if you think we should pay off the judgment up to the limits of the policy, it will be satisfactory to us."

American next wrote Employers on October 23, 1951 that Jones Trucking Company had put up their portion of collateral for the appeal bond, that the bond had been filed, that Jones' attorney demanded that the case be settled for $25,000. In that letter, American also stated that new evidence had been found to minimize Eppler's injuries. On February 2, 1952, American advised Employers that Eppler died of coronary occlusion and that American was awaiting the advice of its attorneys as to the effect of the death upon the appeal. On May 6, 1952, Employers wrote American, asking if anything could be done toward settlement. American replied on May 22, 1952, stating that it would be necessary for the administrator of plaintiff's estate to revive the action within a year, that plaintiff would also be required to revive judgment, and that defendant would have to revive the appeal. Employers requested a status report from American on February 19, 1953, to which American replied on February 24, 1953 that the motion for revivor had been granted in the name of Eppler's Administratrix, and that the

appeal was still pending. On September 10, 1953, American wrote to Employers that the case had been argued before the Supreme Court of Oklahoma and was ripe for decision, that the accumulating interest on the $31,000 judgment brought the total amount involved to approximately $35,000, that plaintiff's attorney offered to settle the judgment, interest and costs for $26,500 but that American could not recommend such a settlement. The next information which Employers received concerning the Oklahoma case was a copy of American's letter to its claim representative which acknowledged that Eppler's attorney had offered to settle for $26,388.75, (which was three-fourths of the judgment and interest); that American's attorney was of the opinion that if the Supreme Court does not reverse, it will require a remittitur; that American's attorney recommended a counter-offer of $15,000 which the adjuster had authority to make; and, this letter referred to the reinsurer in the following language:

> "We haven't taken the matter up with our reinsurance company but we feel rather confident that they will agree with us that if we can settle the outstanding judgment and interest for $15,000.00, we should do so."

By notation on the copy of this letter to its adjuster, American informed Employers that it would be willing to go as high as $18,000, and requested the views of Employers. Employers replied on November 3, 1953, that they would be very glad to follow American's suggestion on the maximum amount to be paid, and that Employers would rather have this case settled than have the court pass upon it. American's letter of December 22, 1953, advised Employers that the judgment had been affirmed but that American was moving for rehearing and still attempting settlement. On February 9, 1954, American wrote Employers that the petition for rehearing had been denied and that American was satisfying $25,000 of the judgment, its policy limits, which it had to do under the treaty, be-

fore it could request Employers to send American a check for $15,000. American further stated that the share of Employers' expenses would be billed later. Employers responded on February 12, 1954, enclosing a check for $15,000.

L. C. Jones Trucking Company v. American Fidelity and Casualty Company, (officially reported as American Fidelity & Casualty Company v. L. C. Jones Trucking Company, Okl.1957, 321 P.2d 685) was the action brought by the basic insured against American, praying damages for American's "bad faith" in refusing to settle the $31,000 judgment, supra, plus interest, when it could have done so within the basic policy limits of $25,000, as hereinbefore noted. American informed Employers of this action on August 5, 1954, shortly after receiving the summons. Further correspondence passed between the parties so that Employers was kept informed of the status of this case. A verdict was returned in favor of Jones Trucking Company against American for $7,133.49, and the judgment for this amount was affirmed on appeal. On November 29, 1957, Employers disclaimed any financial interest to American as a consequence of judgment secured by the basic insurer against American in that action.

### Case Number 11814.

In Case No. 11814 a claim is asserted by American, against Employers, for loss paid by American in excess of primary policy coverage ($40,000) in respect to a claim of the Greyhound Corporation, arising in the State of Florida, for American's "bad faith" failure and refusal to settle the claim of one Jones, made against Greyhound Corporation, within the limits of coverage provided by such policy, when American had an opportunity to do so before suit and trial of such claim. The appellate opinion, premising liability on American in that instance, is officially reported as American Fidelity & Casualty Company v. Greyhound Corporation, 5 Cir., 1956, 232 F.2d 89 and 5 Cir., 1958, 258 F.2d 709. The litigation resulting from the claim will hereinafter be referred to as "Florida claim."

By Exhibit "B", the applicable reinsurance treaty, Employers agreed to indemnify American against loss in excess of $10,000 arising or accruing to American under any policy of a certain type issued by American during the reinsurance period:

"Provided, that the liability of (Employers) in any one accident or event *shall be limited to the amount ceded* hereunder by (American) and shall not exceed Ninety Thousand ($90,000.00) Dollars on account of bodily injury to or death of one person * * *." (Emphasis added.)

(In this case, "the amount ceded" is tantamount to the phrase "within applicable policy limits" contained in the reinsurance agreement involved in Cause Number 11895, previously discussed.) The amounts ceded by American, in this instance was $30,000. The treaty provides that the Reinsurer and Reinsured were to bear that portion of court costs, interest upon judgments, first aid medical expense, legal and investigation expense, as the loss sustained and paid by each bears to the total amount of the loss borne by both. Condition 4 of the treaty, dealing with "Contingent Commission" provided that American shall receive a certain contingent commission on all net profits accruing to Employers from "reinsurance ceded to it hereunder." By Condition 6, American agreed to investigate and defend claims, to give prompt notice to Employers of any "event or development" which in the judgment of American might result in a claim against Employers, and that the reinsurer has the right at its own expense to participate jointly with the reinsured in the investigation, adjustment or defense of claims upon which, in the judgment of the reinsurer, it is or might become interested or exposed. Condition 6 also provided that in the event of a judgment which shall exceed American's Retention, if the parties agree upon an appeal therefrom, the costs and expenses shall be borne in proportion to their respective losses. If they fail to agree, either party may perfect the appeal at its own expense.

Condition 10 of the treaty gives Employers the right to peruse American's records at all reasonable times, pertaining to risks reinsured, but goes on to provide that "it is understood and agreed that the business of (American) in which (Employers) has a reinsurance interest hereunder is the sole and absolute property of (American) * * *." Condition 14 of this treaty defines the term "Primary Insurance" as referring to the policy of insurance issued by American to its assured, who is defined as the "Primary Insured", and defines "Retention" as the amount or amounts retained by American out of policy limits of the primary insurance.

It is to be noted that neither the treaty in this case nor the treaty in Case Number 11895 contains any provision to the effect that liability of Employers "shall follow that of" American, or any other provision that may be similarly construed.

American first advised Employers of the Florida litigation by letter dated October 26, 1951, in which it was stated that the case hadn't previously been reported because "we have never felt or believed that the reinsurer would be involved." We do not "now believe the reinsurer should be involved, however, there have been recent developments in the file which cause us to feel that we should give you a precautionary report as the case is set for trial on November 5th at Miami, Florida." The letter went on to say that immediately after the accident American's representative had contacted the Joneses, but was unable to get them to talk settlement; that thereafter, it having heard nothing further from the Joneses, it had closed its file in respect to such claim without payment, as it appeared that no claim was going to be filed and that the Joneses had forgotten about the claim. That the only offer of settlement ever made by the Joneses was a demand for $25,000 "which was obviously ridiculous." After suit was filed on the Florida claim, American offered $4,500 in settlement thereof. It is stated that although plaintiff's then at-

torney was willing to accept such sum, the same was unsatisfactory to the plaintiff Jones, who insisted that the case be referred to another attorney in Miami, Florida; that the claim was so referred, and thereafter newly retained counsel refused to discuss settlement with American. The letter went on to inform Employers that the case was set for trial on November 5, 1951, at Miami, Florida. Employers' reply of November 6, 1951, asked to be kept closely advised as to settlement negotiations. On November 7, 1951, American wrote again, enclosing certain of its investigators' reports and also stating that in previously advising that the suit was for $75,000 it had overlooked the fact that when the Miami attorney was brought into the case the *ad damnum* was increased to $250,000. This letter went on to state, "We simply can't evaluate this case" and that "in the face of (the Miami Attorney's) attitude and his demand, it seems we have no alternative but to try the case, however, we don't like the looks of it and if you have any ideas we would be pleased to hear from you."

American wrote on November 15, 1951, stating that it was shocked at the verdict of $67,500, that it was inconceivable that a jury could award such damages and that demand for settlement was still $150,000 at the time the case went to trial. An appeal was taken from said judgment. During American's appeal it was unable to persuade the plaintiff to accept any reduction in the amount of the verdict for settlement purposes, and same was affirmed, and so reported to Employers in a letter dated August 15, 1952, in which American again said that "the attorney for the plaintiff has at all times refused to make any concessions." On September 30, 1952, American advised that petition for rehearing had been denied and that it was issuing its draft for $40,000, plus interest and costs, and requested Employers to forward its check for $30,000; Employers proportionate share of interest and expense to be billed later. Employers sent its check to American for $30,000 and on December 31, 1954, American bill-

ed Employers for its portion of the defense expense which also was promptly paid.

Greyhound sued American for the excess portion of the judgment Greyhound was required to pay as a consequence of the judgment in the Florida litigation. American informed Employers of the outcome of the excess judgment suit by letter dated May 17, 1955, and stated that a verdict for Greyhound in the amount of $28,988 had been returned against American for "bad faith" in refusing to settle the Jones case within policy limits. American succeeded in securing a reversal and remand for new trial of the judgment in that case, but lost the case again on re-trial, and it was affirmed. (See citations supra.)

On October 26, 1951, American informed Employers that on November 13, 1947, Mr. Jones made a demand of $25,000 "in settlement of the case" which American considered was "obviously ridiculous." It should be noted that this is the only settlement offer within limits of the basic policy coverage received, which was rejected by American without advising or consulting Employers in any way with respect thereto. From the time Employers first heard of the Florida case, the settlement demand was never less than $150,000 and far beyond the basic policy coverage limit.

In Case Number 11814, American's theory of claim against Employers is twofold: (1) That Employers is liable to American "under the aforesaid reinsurance agreement" for all of the excess judgment American paid to Florida Greyhound Lines "and for its proportionate share of the court costs, interest, attorney's fees and expenses incurred" in defense of the claim Greyhound made against American; or (2) In the alternative, for three-fourths (¾ths) of the total loss" paid in the Florida case— Employers' liability therefor being based by American on a claim of joint interest or venture with Employers in the outcome of all the Florida litigation. In Case Number 11895, American premises its claim against Employers squarely on

"breach of contract" (1) on the theory that Employers is liable for the whole excess judgment paid by American to Jones Truck Lines in the Oklahoma litigation, or (2) for three-fifths of such loss on the theory that Employers' "participation in the refusal to settle" the Oklahoma litigation, made Employers "a joint adventurer" with American in the transaction, and that being Employers' "interest in the venture."

### Conclusions of Law

The first question presented by the above contentions is whether the reinsurance contracts here considered, by their terms specifically provide indemnity to American for excess judgments rendered against American under the above factual situations; or, is the amount of Employers' liability under the treaties limited by the language thereof to the "limits of liability" set forth in the basic policies? The argument advanced by American in support of its theory of claim is as follows: American says the purpose of reinsurance treaties such as Exhibits "A" and "B" herein, is to indemnify American against loss in excess of its Retention; that a recent trend in insurance law recognizes the liability of an insurer to the insured for amounts in excess of its policy limits, when the insurer negligently, or in bad faith, refuses to accept a settlement offer within basic policy limits; that the fortunes of a reinsurer, under such circumstances, should be held to follow those of the reinsured; therefore, the reinsurance treaty here considered should be held to cover excess judgments obtained against the reinsured, as the reinsurer is *in pari delicto* with the "bad faith" failure of the reinsured to settle the claims in question within the limits of its primary policy obligations.

In support of the foregoing, American in its briefs undertakes a lengthy discourse on "The Nature of Reinsurance and Excess Judgments." Enlightening as such dissertation is, we do not deem it necessary to follow counsel in all the ramifications thereof, nor consider it necessary to cogitate at length upon the specific provisions of the reinsurance treaties here in question, to demonstrate the contractual limits of Employers' liability to American in either one of the above actions. We think it is only necessary to note the following excerpts from American's brief, to demonstrate that contractually Employers admittedly has no obligation to American to stand the whole or any part of the excess judgment claims American here makes in respect to the Oklahoma or Florida litigation above noted. In its brief, under the above quoted heading, American states:

"Insurers follow a practice of reinsuring extensive risks so that large losses will not destroy their companies. Normally, the losses which are suffered by the primary insurer are clearly within or without the applicable reinsurance treaty."

(It should be noted here that the instant reinsurance treaties make specific provisions for the class and character of claims to which the reinsurance treaties are applicable.) However, American says:

"A relatively recent development in insurance law has caused the present disagreement concerning the reinsurer's liability when the reinsured is forced to pay in excess of its coverage. The only case dealing directly on the point has decided the matter in favor of the reinsured. (Peerless Ins. Co. v. Inland Mutual Ins. Co. (4 Cir. 1958) 251 F.(2d) 696.) However, that case took a limited view of the problem since the Court found a ready ground for the liability without considering, *from a contract view only*, to what extent the fortunes of the reinsurer should follow those of the reinsured." (Emphasis added.)

Counsel for American then goes on to discuss the history of "Excess Liability" of insurance companies over policy limitations as hereinabove noted, and observes that since primary "policy limitations provide no defense" to such claims * * * "a reinsured often risks a suit

by the primary insured to defend a given lawsuit and since the reinsurer benefits from those cases in which its defense is successful, it seems only reasonable for the reinsured to share the hazard of an excess judgment should the defense (to such a claim) fail." American then goes on to state:

> "The risk resulting from failing to accept an offer within the policy limits has become an occupational hazard of insurance companies and the standard of care required has been set so high that the most prudent company occasionally finds itself liable in excess of its policy limits."

But, immediately thereafter, in discussing the contractual coverage of Employers as a reinsurer for "the amounts ceded" by American on its policies, it is stated: *"It is unfortunate that Employers treaties do not specifically deal with the foregoing problem."* Hence, it is transparent from the foregoing argument and theory of claim that American admits that Employers' claimed liability to it is not covered by the contract.

That is true:

■ Contractually, the reinsurance treaties Employers has with American do not cover or deal with a factual situation whereby liability is imposed upon Employers for American's "bad faith" or negligent failure to settle a liability claim within the ambit of American's primary policy coverage when American has a reasonable opportunity so to do. The reinsurance treaties, like the primary policies to which they relate, are totally silent in respect to that matter. That is readily understandable because the premise for the liability that caused American to pay to its insureds in the Oklahoma and Florida cases sums in excess of its policy coverage, and which it seeks to here pass on to Employers, is one imposed by the law of torts and not strictly for breach of contract. As said in American Mutual Life Liability Ins. Co. v. Cooper, 5 Cir., 1932, 61 F.2d 446, 448, it is the relationship between the insured and insurer that "imposes upon the insurer the duty, not under the terms of the contract strictly speaking, but because of and flowing from it to act honestly and in good faith toward the insured" that the law imposes liability in such cases. A number of courts not only premise such liability on the insurer for "bad faith" failure to accept a reasonable compromise, but also for negligence in rejecting such an offer. There is no need to multiply citations on the "Duty of a Liability Insurer to Settle or Compromise" liability claims made against its insured, within policy coverage limits, and the premise therefor, in light of the fulsome annotation on that subject in 40 A.L.R. 2d 168, etc. Suffice to say that aside from the contractual obligation the relationship of insurer to insured imposes a duty on the insurer to use "good faith" in effecting a settlement of its insured's liability. Failure so to do (i. e. by "bad faith") gives rise to a claim for damages sustained. "Bad faith" in such instances arises independent of the contract obligation, and anciently has been determined to be an "action [sounding] in tort, not in contract." Attleboro Mfg. Co. v. Frankfort Marine Accident & Plate Glass Ins. Co. (Frankfort Marine Accident & Plate Glass Ins. Co. v. Attleboro Mfg. Co.), 1 Cir., 1917, 240 F. 573; State Automobile Mut. Ins. Co. of Columbus, Ohio v. York, 4 Cir., 1939, 104 F.2d 730.

■ In the case at bar, American does not charge Employers with the use of "bad faith" or "negligence" in respect to either of the instant claims. On the contrary, it is well to note that it is the "bad faith" adjudicated on the part of American that is the sole premise of the claims here asserted. That is to say, American here seeks to impose liability on Employers for its own adjudicated "bad faith" merely because of the contractual relationship between the parties, on the theory that Employers liability as a reinsurer "follows that of (American) in every case," as a matter of law. Seemingly, American's sole authority for premising such liability is the ruling made in Peerless Ins. Co. v. Inland Mutual Ins. Co., supra. It does not appear

necessary to lengthen this memorandum by comparing the ruling here made to that in the Peerless case, to demonstrate the inapplicability of the latter to the factual and legal situation here. Suffice to say, the reinsurance treaty in the Peerless case specifically provided that "the liability of the reinsurer (Peerless) shall follow that of the Company (Inland) in every case." A reading of the Peerless case reveals that it was because of that provision of the reinsurance contract there considered, and the excess liability claim resulting from the particular dealings between the parties in the Peerless case, that the Court there "took a limited view of the problem * * * and found a ready ground for the liability without considering, from a contract view only, to what extent the fortunes of the reinsurer should follow those of the reinsured." Here, the reinsurance contracts, and factual situation giving rise to the excess claims made in the case at bar, make it transparent that the Peerless case is no authority in support of American's position. Clearly, the nature of the reinsurance contracts here is that of "indemnity" to the reinsured against "loss" within specified limits set forth in the reinsurance contracts. The instant contracts cannot be construed as providing indemnity against liability to American or to the primary insured. (cf.) Homan v. Employers Reinsurance Corp., 1939, 345 Mo. 650, 136 S.W.2d 289, 127 A. L.R. 163. No privity exists or is created between the original insured and the reinsurer under the type of reinsurance contract here considered. "Reinsurance involves no transaction or privity between the reinsurer and those originally insured." Morris & Co. v. Skandinavia Ins. Co., 1928, 279 U.S. 405, 408, 49 S.Ct. 360, 361, 73 L.Ed 762; 46 C.J.S. Insurance § 1220(b), p. 196. By the terms of the instant reinsurance contracts, the "reinsurer's liability does not follow that of the reinsured," but is singularly one of indemnity after the reinsured has discharged its liability to the primary insured. That being so, absent a charge of "specific bad faith" on the part of

Employers in respect to a duty owed to American, it is difficult to determine any legal basis for the claims American here makes against Employers. The only apparent basis for such liabilities would be on the theory that Employers and American were engaged in a joint enterprise in respect to the liability imposed on American for the latter's "bad faith" failure to compromise its primary claims; or that Employers joined with American in its tortious breach of the latter's policy obligations to its insureds. Although American proffers the theory of joint adventure and contribution as the result thereof as a premise of its claim, it does not demonstrate any factual basis therefor. With certainty the instant reinsurance contracts cannot be construed as creating a joint adventure relationship between Employers and American. As above stated, such contracts can only be construed as providing indemnity to American for "loss" actually paid by American in accordance with the provisions of the reinsurance agreements. If American seeks to impose liability upon Employers on the theory that Employers was a joint tort feasor with it in respect to the liability imposed by law on American, then American has no right of contribution against Employers.

"* * * As between actual tortfeasors, the law will not enforce contribution or indemnity. Public policy demands that two or more wrongdoers shall be left as to each other where their joint offense leaves them." Fidelity & Cas. Co. of New York v. Federal Express, 6 Cir., 136 F.2d 35, 40; 18 C.J.S. Contribution § 11, p. 14.

The rule is here invoked that whenever there is a connection between plaintiff's cause of action and its own wrongdoing, this Court will not lend its aid to the plaintiff to recoup that loss; nor will it undertake to adjust the rights or equities between the parties if it is claimed that they are *in pari delicto*. Missouri District Tel. Co. v. Southwestern Bell Tel. Co., 338 Mo. 692, 93 S.W.2d 19.

Motion of American Fidelity and Casualty Company for summary judgment in its favor, filed in each of the above actions, is by the Court denied.

Motion of Employers Reinsurance Company for summary judgment in its favor, filed in each of the above actions, is by the Court sustained. Counsel prepare judgment entry accordingly.

It is so ordered.