Robert OTT, Receiver of DeNoon Beach, Inc., a Wisconsin corporation, Plaintiff-Appellant-Petitioner,

v.

ALL-STAR INSURANCE CORPORATION, a Wisconsin corporation, North Star Reinsurance Corporation, a New York corporation, Richard Hippenmeyer, Continental Casualty Company, a foreign corporation, Defendants-Respondents.

Supreme Court

*No. 78-757. Argued September 30, 1980.—Decided January 6, 1981.*

(Also reported in 299 N.W.2d 839.)

For the appellant-petitioner there were briefs by *Patrick O. Dunphy* and *Habush, Habush & Davis, S. C.*, and oral argument by *Howard Davis*, all of Milwaukee.

For the respondents there was a brief by *John A. Kluwin, Eric J. Van Vugt* and *Kluwin, Dunphy, Hankin & McNulty* of Milwaukee, and oral argument by *Eric J. Van Vugt*.

HEFFERNAN, J. The issue in this case is whether an excess-of-policy-coverage clause physically incorporated later into a reinsurance treaty between the North Star Reinsurance Corporation and the All-Star Insurance Corporation made North Star the liability insurer of All-Star in respect to actions brought against All-Star by its own insured, DeNoon Beach, for its bad faith or the negligent failure to settle a third-party claim within policy limits.

We conclude that the excess-of-policy-coverage clause added to the original reinsurance agreement made North Star the liability insurer of All-Star. Accordingly, DeNoon Beach, Inc., an insured of All-Star, which alleges that company committed the tort of bad faith, may bring an action directly against North Star as the insurer of the tortfeasor insurance company.

The trial court found there was no right of direct action and dismissed the plaintiff's complaint against North Star. The Court of Appeals without opinion summarily affirmed the trial court. We reverse the decision of the Court of Appeals.

This case arises out of litigation which came before this court in *Gould v. Allstar Insurance Co.*, 59 Wis.2d 355, 208 N.W.2d 388 (1973). The facts recited in that opinion show that Douglas Gould was injured while diving on the premises of DeNoon Beach, Inc. Those injuries left him a quadriplegic. Gould sued DeNoon and its liability insurer, All-Star Insurance Corporation (the company). The company had agreed to pay on behalf of DeNoon all sums up to $100,000 which DeNoon would become legally obligated to pay as damages because of bodily injury resulting out of the ownership, maintenance, or use of the insured premises. Gould obtained a judgment against DeNoon and the company for a sum in excess of $500,000. This court affirmed the judgment. After judgment, All-Star paid the policy limits of $100,000 plus costs to Gould. North Star Reinsurance Corporation, which had entered into a reinsurance agreement with All-Star in 1968, pursuant to that agreement paid 85 percent of that amount to All-Star. Subsequently, DeNoon Beach, Inc., became insolvent.

The present action was commenced against North Star and All-Star by Robert Ott, the receiver of DeNoon. He alleged that All-Star committed the tort of bad faith in its handling of the Gould claim and alleged that North Star was the liability insurer of All-Star in respect to its tortious failure to settle within policy limits.

The original agreement between North Star Reinsurance Corporation of New York (reinsurer) and the All-Star Insurance Corporation (company) became effective on May 15, 1968. This agreement set forth conditions under which the reinsurer would pay the company for its losses on insurance policies written by the company for its own insureds.

Article III of the original agreement in parts relevant to this controversy provided:

*"Article III*
*"LIABILITY REINSURED:*
"The actual payment by the Company of any loss (except in the event of insolvency of the Company) shall be a condition precedent to any recovery under this Agreement, and subject to such condition, the liability of the Reinsurer shall follow that of the Company and shall be subject within the applicable policy limits in all respects to all the general and special stipulations, clauses, waivers and modifications of the Company's policy, binder, or other undertaking, and any endorsements thereon.
". . . ."

As a part of the original agreement, Exhibit A, attached thereto, provided, *inter alia,* the following with respect to losses paid by All-Star arising out of third party bodily injury claims against its insureds:

*"Exhibit A*
"Attached to and made a part of AGREEMENT No. NS–1142
"EXCESS REINSURANCE OF
"Third Party Bodily Injury (including Medical Payments) . . . .
*"Section 1*
". . . [North Star] shall indemnify and reimburse the Company for all losses paid in cash by the Company in excess of [the first $15,000] as respects each accident, subject to a maximum liability of Nine Hundred Seventy Thousand Dollars ($970,000) to the Reinsurer. . . . The foregoing reinsurance shall apply only to those claims resulting from any one accident which are covered within the actual limits of liability attaching under policy or policies of the Company provided, however, said limits of liability shall not exceed the following:
". . . .
"Third Party Bodily Injury Business $100,000 each person
". . . ."

The agreement, however, was later altered by a number of addenda. One of these, Addendum 5 (effective

January 1, 1971) added the following paragraph to immediately follow the above-quoted language of Article III:

"*ADDENDUM NO. 5*

"Attached to and made a part of AGREEMENT NO. NS–1142

" . . . .

"1. The following wording shall be added to the first paragraph of Article III *LIABILITY REINSURED:*

"Notwithstanding the foregoing it is also agreed that should the Company become legally obligated to pay a loss in excess of its policy limits the Reinsurer agrees to assume seventy-five percent (75%) of that part of such loss (plus proportionate loss expense) which is in excess of the policy limit. However, in the event the applicable policy limit is less than the Company's retention at the time of the loss, the amount hereby assumed by the Reinsurer shall be limited to seventy-five percent (75%) of that part of the loss (plus proportionate loss expense) which is in excess of said retention. In no event, however, shall the liability of the Reinsurer, respecting such loss, exceed the maximum amounts of liability set forth in the Exhibits attached hereto.

" . . . ."

Addendum 5, quoted above, controls the disposition of the present controversy. Although not added to the original agreement until January 1, 1971, it was in effect at the time of Gould's injury. The record does not disclose whether a separate premium schedule existed for the coverage provided by Addendum 5; but at oral argument, it was acknowledged by counsel for North Star that Addendum 5 provided coverage not included in the original reinsurance treaty. That Addendum, plaintiff Ott claims, interjected into an otherwise standard reinsurance agreement, constitutes a liability insurance contract insuring the company against the tort of bad faith.

The trial court dismissed the plaintiff's complaint on the ground that the contract between the company and the reinsurer was a reinsurance agreement and not a li-

ability policy. It concluded, therefore, that the direct action provision of sec. 632.24, Stats.,[1] was not applicable—that personal jurisdiction could not be obtained therefor under sec. 801.05 (10) [2] and 803.04 (2) (b).[3] It also pointed

[1] "632.24 **Direct action against insurer.** Any bond or policy of insurance covering liability to others for negligence makes the insurer liable, up to the amounts stated in the bond or policy, to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured."

[2] "801.05 **Personal jurisdiction, grounds for generally.** A court of this state having jurisdiction of the subject matter has jurisdiction over a person served in an action pursuant to s. 801.11 under any of the following circumstances:

"(10) INSURANCE OR INSURERS. In any action which arises out of a promise made anywhere to the plaintiff or some 3rd party by the defendant to insure upon or against the happening of an event and in addition either:

"(a) The person insured was a resident of this state when the event out of which the cause of action is claimed to arise occurred; or

"(b) The event out of which the cause of action is claimed to arise occurred within this state, regardless of where the person insured resided."

[3] "803.04 **Permissive joinder of parties.** . . .

"(2) NEGLIGENCE ACTIONS: INSURERS. (a) . . . .

"(b) If an insurer is made a party defendant pursuant to this section and it appears at any time before or during the trial that there is or may be a cross issue between the insurer and the insured or any issue between any other person and the insurer involving the question of the insurer's liability if judgment should be rendered against the insured, the court may, upon motion of any defendant in the action, cause the person who may be liable upon such cross issue to be made a party defendant to the action and all the issues involved in the controversy determined in the trial of the action or any 3rd party may be impleaded as provided in s. 803.05. Nothing herein contained shall be construed as prohibiting the trial court from directing and conducting separate trials on the issue of liability to the plaintiff or other

out that DeNoon Beach had no common law right of action against the reinsurer, because DeNoon was not privy to the contract between the company and the reinsurer.

The Court of Appeals without discussion or analysis summarily affirmed the trial court's order of dismissal. The Court of Appeals took the same position as the trial court. It assumed that North Star was simply the reinsurer of All-Star and relied on the accepted rule that an insured cannot sue its insurer's reinsurance company.

The plaintiff Ott does not disagree with the proposition of law relied upon by the trial court and Court of Appeals. Rather, he asserts that the analysis of both courts begs the question. Both the trial court and the Court of Appeals, plaintiff contends, assume that, because the document in its totality is entitled, "Reinsurance Agreement," the law in respect to reinsurers is applicable. Those courts, plaintiff asserts, assumed the very point in issue. Ott contends that Addendum 5, added to the treaty in 1971, cannot appropriately be construed as a reinsurance agreement, but only as an independent insuring clause by which North Star agreed to become the liability insurer of the company for the company's tortious conduct which exposed its insureds to liability in excess of the policy limits.

If the agreement, Addendum 5, constituted no more than a reinsurance agreement, it is clear that the trial court and the Court of Appeals were correct. If those courts incorrectly failed to perceive that Addendum 5 in fact constituted a separate insurance agreement insuring a risk resulting from the company's own conduct, they

party seeking affirmative relief and on the issue of whether the insurance policy in question affords coverage. Any party may move for such separate trials and if the court orders separate trials it shall specify in its order the sequence in which such trials shall be conducted."

were clearly wrong in their conclusions. If Addendum 5, by which the reinsurer agreed to "assume" 75 percent of the losses "in excess of [All-Star's] policy limit" which All-Star may "become legally obligated to pay" was not indemnity reinsurance, but instead was a contract which made North Star a direct liability insurer of All-Star with respect to any actions against All-Star for its negligence, direct action may be brought by the injured party against the tortfeasor's insurer.

Accordingly, this court must address itself to the question which the Court of Appeals failed to consider: Is Addendum 5 merely a part of the reinsurance agreement or is it a separate policy of liability insurance which inadvertently was physically incorporated in the reinsurance treaty?

This court has heretofore commented that, within both the insurance industry and the courts, "reinsurance" is a term frequently used with imprecision. *State Dept. of Public Welfare v. Central Standard Life Ins. Co.*, 19 Wis. 2d 426, 434, 120 N.W.2d 687 (1963). This court, however, in *Franklin Mutual Insurance Co. v. Meeme Town Mutual Fire Ins. Co.*, 68 Wis.2d 179, 181, 228 N.W.2d 165 (1975), adopted the definition of the term used in 13 Appleman, *Insurance Law and Practice:*

" 'Reinsurance is a contract whereby one insurer for a consideration contracts with another to indemnify it against loss or liability by reason of a risk which the latter has assumed under a separate and distinct contract as the insurer of a third person.' P. 460, sec. 7693.

" 'Reinsurance, to an insurance lawyer, means one thing only—the ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the reinsured, which is the ceding company, and in which contract the ceding company retains all contact with the original insured, and handles all matters prior to and subsequent to loss.' PP. 433, 434, sec. 7681."

Primary insurers, such as All-Star, may purchase reinsurance for a variety of purposes:

"1. To reduce their exposure to liability on particular risks and to obtain a greater spread of risk;

"2. To protect against accumulations of losses arising out of catastrophes;

"3. To reduce total liabilities to a level appropriate to their premium volume and capital;

"4. To provide greater capacity to accept new risks and write policies involving larger amounts than could otherwise be written;

"5. To help stabilize operating results; and

"6. To obtain assistance with new concepts and lines of insurance." Nutter, *Insurer Insolvencies, Guaranty Funds, and Reinsurance Proceeds,* 29 Fed. Ins. Counsel Q. 373, 374 (1979).

Reinsurance is written in two basic types: "Pro rata" and "excess." In "pro rata" insurance, the reinsurer and the primary insurer share in an agreed fixed proportion of the premiums paid by the primary insured and in any losses which occur. In an "excess" (or excess of loss) reinsurance agreement, the reinsurer becomes liable on a loss only when the loss exceeds an agreed dollar amount. This amount, for which the insurer alone is responsible, is known as the insurer's "retention." *See* generally, Nutter, *Insurer Insolvencies, Guaranty Funds, and Reinsurance Proceeds, supra,* 374; Dowd, *Punitive or Extra-Contractual Awards Against Insurers: The Reinsurer's Role,* 28 Fed. Ins. Counsel Q. 281, 282 (1978); Evans, *The Many Dimensions of "Follow the Fortunes,"* 40 Ins. Counsel J. 318, 323 (1973); K. Thompson, *Reinsurance* 111–13, 132–38 (3rd ed. 1951).

The terms of the original agreement between the company and the reinsurer prior to the amendment of Article III by Addendum 5 clearly constituted a reinsurance treaty of the "excess" type. Not only did Exhibit A so denominate it, but the effect of the agreement accorded

with the criteria approved by this court in *Franklin Mutual*. Under Article III, the reinsurer was to "follow" the company's liability and to reimburse the company for actual payments made on claims against the company's insureds. In general, Exhibit A set the "retention" level of All-Star's liability at $15,000 on any losses. Article III and Exhibit A together set two types of ceilings on the reinsurer's liability for claims against the company: The reinsurer would pay the excess of All-Star's $15,000 retention only up to policy limits, and the maximum policy All-Star was authorized to issue under the terms of Exhibit A was $100,000 per insured. The reinsurer's maximum liability *in toto* was $970,000.

At oral argument, counsel for both litigants agreed that, in intent and in operation, the agreement as originally drawn was one of "reinsurance" and did not constitute in any sense a policy of insurance intended to protect the company against liability for its own torts. Ott argues, however, that what was originally clearly a contract of reinsurance only was partially converted into a liability insurance agreement by Addendum 5, which became effective on January 1, 1971. Unlike the prior provisions of the agreement, which in all cases limited the reinsurer's liability only *up to the company's policy limits*, Addendum 5 imposed responsibility on the reinsurance company for losses *in excess of policy limits*. For such excess amounts, North Star agreed to pay 75 percent of All-Star's losses. On the other hand, under the original agreement, in the discharge of the policy limits of Gould's claim, the company "retained" or paid $15,000, and the reinsurer paid the excess up to the policy limit of $100,000, or $85,000. Under Addendum 5, when All-Star incurs liability in excess of the policy limits of $100,000, the reinsurance company is required to pay 75 percent of the amount above the policy limits.

■
North Star does not dispute that liability for such excess may be incurred. The reinsurer, however, characterizes its responsibility under Addendum 5 as simply additional "reinsurance" and not as a separate insurance agreement added to the reinsurance treaty. As stated before, if it is merely additional reinsurance, no direct action can be brought by a party not privy to the contract. If, however, North Star has insured All-Star for All-Star's own torts, it is a liability insurer and may be sued directly. Although Addendum 5 was later incorporated into the contract as part of Article III, captioned "Liability Reinsured," it is the substantive meaning and operation of Addendum 5, rather than the place of physical insertion in the original agreement or the heading of the Article, which must determine its legal nature and effect. *See State Dept. of Public Welfare v. Central Standard Life Ins. Co.*, 19 Wis.2d 426, 434, 435, 120 N.W.2d 687 (1963). 13A Appleman, sec. 7686, p. 502, also points out that the meaning of an agreement between one insurance company and another is not to be determined by the caption but rather from the provisions and terms of the contract itself.

When an insurance claim by an injured third party is litigated rather than settled, it may result in judgment against the insured party that is in excess of policy limits. This occurred in the instant case when trial resulted in a judgment of over $500,000—$400,000 in excess of coverage. Under these circumstances the insured, De-Noon, became liable to Gould for the balance of the judgment that remained unpaid by All-Star. DeNoon in this action is attempting to recover its own exposure to liability from All-Star by proving that All-Star's negligent or bad faith failure to settle the claim within the applicable policy limits caused DeNoon's exposure.

Such action, although it, of course, "arises from" the contractual relation of the parties to an insurance policy,

is founded in tort. *Alt v. American Family Mut. Ins. Co.*, 71 Wis.2d 340, 347–49, 354, 237 N.W.2d 706 (1976) ; *Employers Reinsurance Corp. v. American Fidelity and Cas. Co.*, 196 F. Supp. 553, 560 (1959). The insurer's liability under the action is thus often referred to as "extracontractual." *See, e.g.*, Thornton, *Extracontractual and Punitive Damage Liability of Insurers, Primary and Reinsurance Coverages*, 13 The Forum 754 (1978) ; Koesterer, *Liability in Excess of Policy Limits*, 27 Fed. Ins. C.Q. 287 (1977) ; Dowd, *supra*, at 282–83.

Because insurance companies tend to arbitrate differences rather than litigate them, case law on a *r*einsurer's liability for the insurer's tortious failure to settle within policy limits is notably sparse.

The leading case in this area is *Peerless Insurance Co. v. Inland Mut. Ins. Co.*, 251 F.2d 696 (1958). In *Peerless*, the insurer (not the original insured) brought an action against its reinsurer to recover a portion of an excess-of-policy-limits award which it became liable to pay its insured, under a judgment, for tortious failure to settle a third party claim. The court held the reinsurer liable on a joint enterprise theory. The reinsurance agreement in that case provided that the reinsurer's liability would "follow" that of the insurer and that the reinsurer had a right to be associated with the insurer in defense or settlement of claims. Because of the "follow the fortunes" clause and the reinsurer's informed choice to forego its contractual right of active participation in settlement of the claim and instead to acquiesce in the settlement decisions of the insurer, the court held the reinsurer liable to the insurer for a part of the judgment imposed on the latter in the prior action based on bad faith failure to settle.[4]

---

[4] As noted earlier, the "follow the fortunes" and direct participation rationale has been abandoned by Ott, at least in the present posture of the case. From statements made at oral argument by plaintiff's counsel, present reliance is only on Addendum 5 and not upon the original agreement of reinsurance.

*Peerless* was soon followed by *Employers Reinsurance Corp. v. American Fidelity and Casualty Co.*, 196 F. Supp. 553 (1959). In that case the court distinguished *Peerless* and held the reinsurer not liable to the insurer for the latter's liability to its insured for tortious failure to settle. The reason was that, unlike *Peerless,* the reinsurance contracts in question contained no "follow the fortunes" language (and there was no proof of joint venture, participation, or acquiescence in the tort by the reinsurer). *Id.* at 560–61. The court said:

"[T]he nature of the reinsurance contracts here is that of 'indemnity' to the reinsured against 'loss' within specified limits set forth in the reinsurance contracts. The . . . contracts cannot be construed as providing indemnity against *liability* to [the insurer/reinsured] *or to the primary insured."* (Emphasis supplied). *Id.* at 561.

In the wake of *Employers Reinsurance,* many insurers saw the need for express contractual coverage of their own exposure to such tort actions to protect themselves against judgments *in excess of policy limits* for which they might become liable.[5] Thus, according to one commentator, were born "Excess of Policy Limits Clauses" such as Addendum 5 in the present agreement. These clauses were inserted into insurers' treaties with their reinsurers. Dowd explains their origin:

"The Judgment in Excess of Policy Limits Clause was designed to deal with the loss in excess of policy limits situation. This clause, the specific provisions of which

[5] For an example of the ambiguity which remains *without* such a clause, *see, Nationwide Gen. Ins. Co. v. Investors Ins. Co. of America,* 37 N.Y.2d 91, 371 N.Y.S.2d 463, 332 N.E.2d 333 (1975). Whether reinsurance contract that is silent respecting coverage of insurer's tortious failure to settle does or does not provide such coverage is a matter for arbitration. It should be noted that, although the treaty at issue in the instant case provides for arbitration, neither party, insofar as the record reveals, has sought that method of dispute reconciliation.

vary from reinsurer to reinsurer, generally provides if and under what conditions the reinsurer will participate in the awards arising from excess judgments. It was motivated by the 1959 holding in *Employers Reinsurance Corporation v. American Fidelity and Casualty Company.* In that case a federal district court, in the absence of [contract language imposing on the reinsurer a responsibility to 'follow the fortunes' of the reinsured with respect to losses] found the reinsurer not liable to its reinsured for any portion of judgment in excess of policy limits in the absence of bad faith on the part of the reinsurer . . . .

"The Judgment in Excess of Policy Limits Clause is relatively widely used and provides the reinsurer will participate in such excess verdicts but not to exceed the reinsurance contract limits. The degree of participation by the reinsurer varies, sometimes fixed at a percentage amount, sometimes a proportion of the excess award. This clause and its participation element is the subject of negotiation between the parties.

"The Judgment in Excess of Policy Limits Clause is often the repository of specific extra-contractual, including punitive damage, exclusion language. . . .

"[V]ery few existing reinsurance agreements deal with the extra-contractual liability question with sufficient precision to make predictable the results of disputes which can and will arise. The Judgment in Excess of Policy Limits Clause comes closest to treating the question, but attention must be given to its drafting to include reference to the extra-contractual awards other than pure excess of policy limits. Punitive, compensatory, and consequential damages should be treated, and the effect of reinsurer consultation and concurrence in the handling of claims should be spelled out." Dowd, *Punitive or Extra-Contractual Awards Against Insurers: The Reinsurer's Role, supra,* at 284–86.

It is apparent by its terms that Addendum 5 to the reinsurance agreement entered between North Star and All-Star constitutes such a "judgment in excess of policy limits" clause, and that the central risk against All-Star sought to be protected was the potential that the com-

pany might become liable in tort to one of its insureds for a bad faith or negligent failure to settle a claim within policy limits. Counsel for North Star so stated at oral argument, noting that the issue was not whether the clause made North Star liable (in amount of 75 percent) for a judgment against All-Star for the latter's failure to settle—which was freely admitted—but whether the language constituted "insurance" so as to subject North Star to direct action brought on such a theory by All-Star's insured, DeNoon/Ott.[6]

Another commentator has very recently recognized the legal and practical difficulties of inserting an unrelated liability insurance clause into a traditional-type of reinsurance contract:

"Some reinsurers have agreed to add to their treaties special coverage for this 'excess of limits' exposure either on a total or share basis. . . .

---

[6] There seems to be no controversy over whether Addendum 5 contemplates North Star's financial responsibility for All-Star's settlement-related torts. The only question as to the scope of the clause—a minor and relatively insignificant one—was of any additional intent. At oral argument North Star's counsel, when pressed for any further meaning of the language, stated that it was designed also to include protection for All-Star against reformation of the contract, and that the language was general and broad because of unspecified risks which the vagaries of the different state laws of insurance might subject All-Star to, in light of its multi-state business.

Even had the express acknowledgment of the meaning and intent of Addenum 5 not been forthcoming, its terms clearly demonstrate that tort coverage was within its intended meaning. In contrast to the language of the preceding paragraph of Article III, which conditions North Star's liability on All-Star's "actual payment," Addendum 5 conditions North Star's liability on All-Star's "legal obligation" to pay. The terms of liability, too, are different—75 percent of loss rather than all amounts (up to policy limits) over $15,000. The reference to "proportionate loss expense" appears to refer to litigation costs in defense of potential tort actions.

"In view of the sharp legal distinction which exists between the purely contractual undertakings of a reinsurance agreement and the tort liabilities of the insurance company, it is questionable that the special grant of 'excess of limits' coverage should be made a part of a reinsurance agreement. While responsible contracting parties are generally free to contract as they wish, such coverage in a reinsurance agreement is an anomaly. Marketing considerations aside, it is doubtful that the grant of such coverage should be accomplished in this manner.

". . . if a reinsurer desires to cover the tort liabilities of the insurance carrier, it must consider the limitations of its own charter and perhaps the licensing requirements of the various state insurance departments relating to the writing of liability insurance." Hagner, *Punitive Damages—Insurance and Reinsurance*, 47 Ins. Counsel J. 72, 76 (1980).

In light of the language of the clause in the present case, the inherently limited scope of the nature of reinsurance, the historical background of the development of "excess of policy limits" clauses, implications drawn from scholarly and insurance industry commentary, and the relative bargaining positions of insurance companies between themselves, Addendum 5 in the present case must be held to constitute direct liability insurance running from North Star to All-Star against the latter's liability to its own insured for tortious failure to settle. Consequently, North Star is subject to direct action by Ott, the receiver of DeNoon Beach.

Article III (in conjunction with Exhibit A), as it stood prior to Addendum 5, constituted traditional reinsurance. The first paragraph of Article III, which originally stood alone, preconditions North Star's responsibility to pay All-Star on the latter's "actual payment," and Exhibit A uses the words, "indemnify" and "reimburse," to describe the nature and conditions of North Star's fiscal responsibility. This is classical indemnity reinsurance language. In addition, of course, the original

coverage was only for reinsurance purposes—indemnification of the insurer for risks already contracted for as the insurer of a third person.

The language of Addendum 5, added three years later, is markedly and meaningfully different.

Addendum 5 begins with the phrase, *"Notwithstanding* the foregoing" paragraph of Article III, "it is *also* agreed . . . ." Webster defines "notwithstanding" as "without prevention or obstruction from or by," "in spite of." The word signals an introduction to a further and separate contractual agreement not limited or determined by the preceding paragraph. This conclusion is strengthened by the fact that Addendum 5 was aimed at a risk acknowledged by counsel—All-Star's potential exposure to tort judgment for failure to settle—not covered by the original language of Article III.

Addendum 5 eschews the use of any language implying the necessity of All-Star's actual payment as a prerequisite to North Star's responsibility to make good its commitment. Instead of such language, it states that North Star will "assume" the 75 percent of any loss which exceeds policy limits. This is the language akin to an insurer's liability, rather than a reinsurer's indemnity conditioned on its reinsured's prepayment.[7]

The quotation from *Franklin Mutual v. Meeme Town Mutual, supra,* defining reinsurance states that reinsurance covers "a risk which [the insurer] has assumed under a separate and distinct contract," and "all or a portion of [the insurer's] risks." These statements indicate

[7] The use of "assume," however, does not create a liability insurance policy between North Star and Ott/DeNoon, despite Ott's arguments to that effect in its brief. There was never any agreement of any sort between Ott and North Star, distinguishing the contractual relations in this case from those in *State Dept. of Public Welfare v. Central Standard Life Ins. Co.,* 19 Wis.2d 426, 435, 120 N.W.2d 687 (1963), where direct contractual relations developed between the insured and the reinsurer, the reinsurer thereby "assuming" the primary policies.

that the nature of the risk covered by the reinsurance is defined and circumscribed by the risk covered in the primary insurer's policy with its own insured. The reinsured risk "must be the same as that covered by the original insurance policy." 19 Couch *on Insurance 2d,* sec. 80:51, p. 947 (1968).[8] The reinsurer provides to the insurer whole or partial protection against "a risk which [the insurer] has undertaken . . . ." 13A Appleman, *supra,* sec. 7681, p. 484. *See also id.* at sec. 7693, p. 524 (". . . a contract of reinsurance extends no further than the risk taken by the original insurer, which cannot stipulate for indemnity against a risk which it has not undertaken") ; *id.* at sec. 7699, p. 557 (in action on a reinsurance policy, the "reinsurer is only liable for the amount for which the insurer is legally liable").

As stated above, an insurer's liability to his insured for tortious failure to settle within policy limits is "extra-contractual." Because such liability is not a risk against which protection is extended to the insured, it cannot, under the above definitions, be a proper subject for "reinsurance." By definition such risk cannot be reinsured. The subject matter of Addendum 5 is not reinsurance.

As discussed, the lead cases of *Peerless Insurance Co. v. Inland Mutual Ins. Co., supra,* and *Employers Reinsurance Corp. v. American Fidelity and Casualty Co., supra* (both of which were controversies between insurance companies, not involving the insureds as parties), led to

---

[8] Citing cases where the identity of the risks covered under the insurance and reinsurance agreements were at issue. *See, e.g., The Philadelphia Ins. Co. v. The Washington Ins. Co.,* 23 Pa. 250 (1854), where the *in*surance covered a ship's travels for a period of time, and the *re*insurance covered a particular voyage; the court held the reinsurance coverage *was* within the scope of the insurance risk. The reinsured risk can be for some lesser insurable interest than is the primary policy, but no greater an insurable interest; there must be "identity in the subject matter and the kind of perils." *Id.* at 253.

the insertion of excess-of-policy-limits clauses like Addendum 5 to protect the insurer against tort liability from its insured, and such protection is separate and distinct from that afforded by reinsurance.

The *Peerless* court's inquiry was whether the reinsurance coverage, as a matter of contractual terms[9] and of the reinsurer's behavior during settlement negotiations,[10] provided protection.

The *Employers Reinsurance* court focused on the contractual terms and found that, absent the "follow the fortunes" language present in *Peerless,* the contract did not provide liability insurance to the insurer—nor, in dicta, "to the primary insured." *Employers,* 196 F. Supp. at 561. But in neither case did the inter-insurer contract contain "excess of policy limits" coverage like Addendum 5. The presence and meaning of that provision in the present case creates a different contractual relationship between the insurer and reinsurer than existed in *Peerless* or *Employers.* Addendum 5 made North Star the liability insurer of All-Star. It provided coverage for All-Star's torts in connection with All-Star's relations with its own insureds.

A review of the literature discussing the purposes of reinsurance discloses no mention of the insurer's tort liability as one of the purposes.

Moreover, the most recent discussion of the insertion of excess-of-policy-limits tort liability coverage within

---

[9] The reinsurance agreement in *Peerless,* except for its lack of any clause like Addendum 5, was remarkably similar to the one between North Star and All-Star; the two were apparently modeled on the same standard form. *See Peerless,* 251 F.2d at 697–98.

[10] The present case is ambiguous as to whether North Star's participatory behavior (or lack thereof) during settlement is alleged to be a ground of its direct amenability to suit. Because the case is before this court on a motion to dismiss, the record provides no factual information as to the extent or lack of North Star's involvement in settlement negotiations.

a reinsurance agreement notes, in commenting on the anomalous nature of the practice, that "[the reinsurer] must consider the limitations of its own charter and perhaps the licensing requirements of the various state insurance departments relating to the writing of *liability* insurance." (Emphasis supplied.) Hagner, *Punitive Damages—Insurance and Reinsurance, supra* at 76. This passage, appearing in an article written by the Claims Counsel for the General Reinsurance Corporation, reveals an industry awareness that such clauses may indeed be found by the courts to operate as liability insurance.[11]

Counsel for North Star stated at oral argument that North Star, a New York corporation, apparently does not, by its charter, write underlying liability policies, nor did he believe it had the authority to do so in Wisconsin. Be that as it may—the record provides no evidence one way or the other—it does not, under Wisconsin law, immunize North Star, as All-Star's contractual liability insurer, from Ott's direct action. This is because, although insurers in Wisconsin may not transact business without a valid certificate of authority (sec. 601.04(2), Stats.), nor beyond the terms of their certificate (sec. 610.11(1)), and although insurers domiciled in other states may not engage in practices forbidden in their home state (sec. 610.21(2)), out-of-state insurers who act contrary to their authority may have their contract enforced *against* them (sec. 618.44; sec. 631.15(1)). If,

[11] The article goes on to state that the only ground for a reinsurer's direct liability to a primary insured is actual participation in the settlement tort, and states that, "There is nothing in the [reinsurance] contract which would create such a partnership." *Id.* at 77. This argument does not, however, address the question whether clauses like Addendum 5 create a direct insurance relationship running from the reinsurer to the insurer. The case cited as authority for the author's position is *Employers Reinsurance*, which, as discussed, did not contain a clause like Addendum 5.

as we indeed conclude, Addendum 5 created a liability insurance contract, it will be enforced in Wisconsin.

Counsel also pointed out that the 1971 revised insurance code expressly exempts reinsurance from its regulatory scope. *See* sec. 600.01(1)(b)1, Stats. (enacted by ch. 260, sec. 64, Laws of 1971, codified as sec. 600.01 (1)(a), Stats. (1971), renumbered sec. 600.01(1)(b)1 by ch. 375, sec. 29, Laws of 1975). A Legislative Council note appearing in the bill (SB 469, 1971) and in the 1971 session laws reads:

"NOTE: Certain transactions should be free from insurance regulation in general, though certain specific provisions may be made applicable to them. Sub. (1) lists those transactions.

"Sub. (1)(a) exempts reinsurance. This does not mean that reinsurance is totally free from control, as many specific provisions will show, but in general *the armslength relationships of insurance companies do not require control.*" (Emphasis supplied.)

Because Addendum 5 is insurance, not reinsurance, the exemption of the statute is inapplicable. Moreover, the underlying policy which exempts from regulation inter-insurer agreements is based on the sophistication of insurance companies and their ability to deal with one another on terms of equal bargaining and knowledge as to the meaning of the contractual arrangements. This means that it is the position of the state that insurance companies, dealing at arm's length, will be held to their contractual obligations. No state insurance law is available to exonerate North Star from its contractual obligations.

No argument based on public policy has been advanced why a liability insurer seeking protection against claims by its own insured for tortious failure to settle cannot, and should not, execute such an agreement with another insurer. Obviously, however, principles of good draftsmanship would compel the formulation of an agreement

in a manner which identifies it clearly as being what it is in fact—a liability policy as to which the company assuming the risk is subject to direct action by the insured. Unfortunately, in this case it was placed in the reinsurance agreement with the result, whether intentional or inadvertent, that it created initial uncertainty as to the true nature of the agreement, the scope of its coverage, and the parties who may and may not invoke its provisions in a legal action.

We conclude that, because Addendum 5 constitutes liability insurance rather than reinsurance indemnity, the direct action statute (sec. 632.24, Stats.) is applicable, and Ott's direct action against North Star should not have been dismissed.

Under the contract set forth in Addendum 5, North Star is subject to the jurisdiction of Wisconsin's courts by virtue of sec. 801.05 (10), Stats. (*see* also sec. 618.01 (3) and to joinder under sec. 803.04 (2) ).

*By the Court.*—Decision reversed, and cause remanded to the trial court for further proceedings.